UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

FANNIE D. MINOR,                    )
                                    )
                Plaintiff,          )
                                    )
        v.                          )        No. 2:07 CV 38 DDN
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
                Defendant.          )

## MEMORANDUM OPINION

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the application of plaintiff Fannie D. Minor for disability insurance benefits and supplemental security income under Title II and Title XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the ALJ's decision is affirmed.

## I. BACKGROUND

Plaintiff Fannie D. Minor was born on October 26, 1954. (Tr. 28.) She is 5'7" tall, with a weight that has ranged from 135 pounds to 210 pounds. (Tr. 147, 233.) She received a GED and then completed training as a licensed practical nurse (LPN). (Tr. 152.) She can read and write English. (Tr. 147.) She last worked as a home care nurse for a disabled patient in June 2004. (Tr. 167.)

On October 5, 2004, Minor filed for disability insurance benefits and supplemental security income, alleging she became disabled on June 15, 2004, as a result of depression, back problems, and circulation problems. (Tr. 48, 147.) The application was initially denied on November 24, 2004. (Tr. 28-34.) After a hearing on July 18, 2006, the ALJ denied benefits on November 16, 2006. (Tr. 11-22, 295-340.) On August 3, 2007, the Appeals Council denied plaintiff's request for

review, making the ALJ's decision the final decision of the Commissioner. (Tr. 5-7.)

## II.  MEDICAL HISTORY

On January 4, 2002, Minor saw Dr. Leslie A. McCoy, D.O., complaining of depression, problems sleeping, an ongoing cold, and weight gain, despite a troubled eating pattern.  A physical examination showed her sinuses were non-tender and her lymph nodes were not enlarged.  Dr. McCoy diagnosed her with sinusitis with probable bronchitis, probable depression, and insomnia and abnormal menses stemming from depression.[1] (Tr. 219.)

On January 7, 2002, Minor saw Dr. Larry Nichols, D.O., complaining of depression.  She had crying spells, felt sad and nervous all the time, could not sleep, and had difficulty concentrating and doing her job.  In the past year, she had seen four close family members die.  She also complained of irregular periods and hot flashes.  A physical examination showed Minor had high blood pressure, but that her vital signs were normal.  Dr. Nichols diagnosed her with anxiety, depression, and possible vasomotor syndrome.[2]  (Tr. 217, 219.)

On January 28, 2002, Minor saw Dr. Nichols for a follow-up.  She said she was doing a little better, but still had episodes of feeling tired and depressed.  She noted nausea, vomiting, and diarrhea over the past few days, with some abdominal cramping, and a fever.  A physical examination showed her abdomen was soft and a little tender to palpation, but there was no guarding or rebound tenderness.[3]  There was no evidence

---

[1]Bronchitis is inflammation of the mucous membrane of the bronchial tubes.  Stedman's Medical Dictionary, 213 (25th ed., Williams & Wilkins 1990).  Sinusitis is inflammation of the lining membrane of any sinus. Id., 1426.

[2]Vasomotor refers to the dilation or constriction of the blood vessels.  Stedman's Medical Dictionary, 1691.

[3]Guarding is characterized by a spasm of muscles to minimize motion or agitation of sites affected by an injury or disease.  Stedman's Medical Dictionary, 674.

of masses or organomegaly.[4] Dr. Nichols diagnosed her with depression and viral gastroenteritis.[5] He noted some improvement in her depression with Prozac.[6] He prescribed Lomotil capsules, Tigan for her gastroenteritis, and recommended a low-fiber diet.[7] (Tr. 217-18.)

On October 18, 2004, William L. Minor, Sr., Minor's husband, completed a third-party function report. He noted spending all his time with his wife. In a typical day, Minor spent time around the house, cooked, cleaned, took a bath, and watched television. She was able to dress herself, care for her hair, and watch over her grandchildren. She was able to cook and do chores if she was not sick. She had to go to the bathroom all night. Minor could drive a car, and was able to go out alone. She went out twice a month to buy groceries and household supplies. She was able to pay bills and handle a savings account. She enjoyed watching television, sewing, and fixing things around the house. She did not socialize and spent all of her time at home. Her impairments affected her ability to lift, squat, bend, stand, walk, sit, kneel, and see. She could walk for thirty minutes before requiring rest, but could not walk farther than seven blocks. She could only sit for an hour in a straight-backed chair, and could stand no longer than thirty minutes at a time. She could not see well without her glasses, and could only lift fifty pounds. Her knees made it difficult to kneel and squat, and her back made it difficult to bend. She was able to finish what she

---

[4]Organomegaly, or visceromegaly, is abnormal enlargement of the organs of the digestive, respiratory, urogenital, and endocrine systems, as well as the spleen and heart. Stedman's Medical Dictionary, 1098, 1724-25.

[5]Gastroenteritis is inflammation of the mucous membrane of both the stomach and intestine. Stedman's Medical Dictionary, 636.

[6]Prozac is used to treat depression. http://www.webmd.com/drugs. (Last visited August 22, 2008).

[7]Lomotil slows the movement of the intestines, and is used to treat diarrhea. Tigan is used to treat nausea and vomiting associated with stomach or intestinal problems. http://www.webmd.com/drugs. (Last visited August 22, 2008).

started. Stress made Minor sick to her stomach, and driving made her nervous. (Tr. 111-19.)

On October 18, 2004, Minor completed a work history report. From 1987 to 1988, she worked as a medical technician in a nursing home. From November 1988 to July 2002, she worked as a LPN. From September 2002 to February 2003, she worked as a teacher's assistant at a children's day care facility. From November 2003 to June 2004, she provided personal home care. (Tr. 120-27.)

Minor worked six hours a day, seven days a week providing personal care. As part of the job, she walked five hours a days, and stood, stooped, kneeled, crouched, and handled objects one hour a day. She lifted up to twenty pounds, and frequently lifted ten pounds. (Id.)

Minor worked seven and a half hours, five days a week at the day care facility. As part of the job, she walked and stood five hours a day, stooped three hours a day, and sat, climbed, kneeled, and crouched two hours a day. She frequently lifted fifty pounds or more. (Id.)

Minor worked as a licensed nurse eight hours a day, five days a week. As part of the job, she walked five hours a day, sat and handled objects for two hours a day, and stood, stooped, kneeled, and crouched one hour a day. She frequently lifted a hundred pounds or more. Minor enjoyed working as a nurse and did not believe in sitting behind the desk. But she could no longer do the work anymore. "I have worked myself [too] hard and [too] long, [to the point] where I'm making myself sick." (Id.)

On October 18, 2004, Minor completed a function report. In a typical day, she made breakfast for her husband, worked around the house, did laundry, and used her sewing machine. Sometimes she had to take her grandchildren somewhere. If she was sick, she spent two days in bed, with diarrhea and an upset stomach, unable to eat. Minor cooked for her husband and helped him with his bath. She also cared for her grandchildren. Minor had trouble sleeping and had to go to the bathroom constantly throughout the night. If she was not sick, Minor cooked twice

a day.  Minor was only taking Ibuprofen at the time.[8]  Her back hurt when she made the bed.  She went outside two or three times a day, and was able to drive a car in town.  She went out twice a month for groceries.  Minor did not socialize, but enjoyed watching television, sewing, and fixing things.  Her impairments affected her ability to lift, squat, bend, stand, sit, and kneel.  She could walk three blocks before needing fifteen minutes of rest.  She had no problems paying attention, was able to finish what she started, and could follow instructions.  She had never been fired or laid off.  Stress upset her stomach, and she got nervous driving because she could not see well at night.  (Tr. 128-35.)

On November 4, 2004, Dr. John R. Sparks, D.O., examined Minor. Minor noted a history of back pain, beginning in 1979, when she was pregnant.  The pain was sharp, and occurred mostly with movement.  The pain was 8/10, and became worse if Minor stood for more than thirty minutes, walked farther than three blocks, or sat for longer than an hour.  The pain radiated across her buttocks into the mid-thigh area. Ibuprofen provided some relief.  Minor also complained of circulation problems, with numbness in her fingertips and toes.  Her fingers and toes became numb on daily basis, but randomly, and the numbness lasted for nearly an hour.  Minor complained of depression.  Her husband was disabled and her daughter was in the military and leaving for Iraq.  The death of her mother was also emotionally draining.  She had taken Prozac for two weeks in 1999, but could not afford to take it for a longer period.  Minor had surgery in 1985, to repair a fractured right knee. She smoked a pack a day, for the past thirty-five years, and drank moderately.  (Tr. 167-68.)

A physical examination showed Minor was alert and cooperative, and in no acute distress.  She had a regular heart rate and rhythm, and her lungs were clear.  Her abdomen was soft and there was a slight epigastric tenderness.  Bowel sounds were hyperactive, but there was no evidence of masses, rigidity, guarding, or organomegaly.  There was no evidence of

---

[8]Ibuprofen is an anti-inflammatory drug used to relieve pain and swelling.  http://www.webmd.com/drugs. (Last visited August 22, 2008).

cyanosis, clubbing, or atrophy.[9] Her gait was adequate, she was able to squat without difficulty, could tandem walk, and could toe and heel walk. Minor had no apparent pain, tenderness, or muscular spasm to palpation of the paravertebral spinal area. Minor had full grip strength and good upper and lower extremity strength. Dr. Sparks diagnosed Minor with possible early osteoarthritis and possible mild depression, but found "no physical or emotional reason this patient cannot perform work-related functions." (Tr. 168-74.)

On November 23, 2004, Dr. Glen D. Frish, M.D., a psychiatrist, found Minor suffered from affective disorders, but found these impairments were not severe. Dr. Frish noted Minor suffered from possible mild depression. He found she had a mild difficulty in maintaining social functioning, but no difficulty in maintaining concentration, persistence, or pace, and no restriction in her activities of daily living. Minor had not had any extended episodes of decompensation. Dr. Frish concluded that there was no evidence of a severe mental impairment, and found no further development was warranted. There were no allegations of functional limitations due to mental impairment. (Tr. 175-87.)

On November 24, 2004, Ellvan D. Markley, a disability determination services examiner, denied Minor's application for benefits. On November 4, 2004, her physical exam was normal. On November 23, 2004, Dr. Frisch found that Minor had an affective disorder, but that it was non-severe. Relying on these two medical reports, Markley determined that Minor's condition was non-severe. (Tr. 28-29.)

On December 1, 2004, Minor completed a disability report appeal. Since her last disability report, she had become more depressed, and her back hurt. She did not have any new conditions. She had trouble lifting things, could not sit or stand for very long, and her hips and left knee gave out. She did not sleep at night. (Tr. 136-41.)

On December 14, 2004, Minor went to the doctor, complaining of a headache, back pain, and numbness and tingling in the fingers of her left hand. The pain was keeping her from sleeping. At the time, she was only

---

[9]Clubbing is the broadening of the fingers or toes. <u>Stedman's Medical Dictionary</u>, 320. Cyanosis occurs when the skin becomes purple and blue due to deficient oxygenation of the blood. <u>Id.</u>, 383.

taking Ibuprofen.  A physical examination showed Minor had full muscle strength, clear lungs, and a regular heart rate and rhythm.  Her left knee was slightly tender to palpation.  The doctor diagnosed Minor with polyarthropathies, with symptoms suspicious for radicular symptoms or anxiety symptoms.[10]  (Tr. 215.)

On December 16, 2004, Minor completed an intake screening assessment at the Mark Twain Area Counseling Center.  She complained of feeling depressed - her husband was disabled, her daughter was in Iraq, and her mother had died five years earlier.  A mental examination showed Minor had no homicidal thoughts, one past suicide attempt when she was 24 years old, good judgment, and soft speech.  Her affect was appropriate, her appearance was casual, her insight good, and her intellectual functioning average.  She had been married three times, and an ex-husband of sixteen years had been physically abusive.  Kyla Clark, M.A., L.P.C., found Minor's risk of suicide was low.  At the time of the visit, Minor was taking Flexeril, Aleve, and Ibuprofen.[11]  Clark found Minor to be easy going, and suffering from depression.  She diagnosed Minor with dysthymia and assigned her a GAF score of 60.[12]  (Tr. 195-97.)

---

[10]Arthropathy is any disease affecting a joint.  Stedman's Medical Dictionary, 136.  Radicular refers to the spinal nerve roots.  Id., 1308.

[11]Flexeril is a muscle relaxant and is used with rest and physical therapy to decrease muscle pain and spasms.  Aleve, or Naproxen, is used to relieve mild to moderate pain from various conditions. http://www.webmd.com/drugs. (Last visited August 22, 2008).

[12]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worst of the two components.  On the GAF scale, a score of 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers).  Diagnostic and Statistical Manual of Mental Disorders, 32-34 (4th ed., American Psychiatric Association 2000).

Dysthymia refers to any mood disorder.  Stedman's Medical Dictionary, 480.

On December 22, 2004, Minor received a mammogram.  The doctor noted scattered clusters of microcalcifications, but no masses, and recommended another mammogram in six months for comparison.  (Tr. 206.)

On January 12, 2005, Minor saw Clark for her dysthymia.  Minor was on time and dressed casually.  She worried about her daughter in Iraq and her husband who suffered from chronic obstructive pulmonary disease (COPD).  Clark noticed Minor had trouble walking, and Minor described feeling stiff and sore in her legs and back.  (Tr. 193-94.)

On January 21, 2005, Minor saw Dr. Susan E. Schneider, M.D., complaining of severe itching.  Dr. Schneider diagnosed her with urticaria, possibly from a reaction to a drug.[13]  Dr. Schneider asked Minor to stop taking Flexeril, gave her some samples of Zyrtec, and recommended over-the-counter Calamine.[14]  (Tr. 214.)

On January 27, 2005, Minor saw Clark for her dysthymia.  Minor was dressed casually, somewhat tearful, and moving slowly because of pain.  She had been turned down for Medicaid and developed a defeatist attitude.  She had chronic back pain with tingling in her fingers.  These symptoms made cooking difficult, but with enough breaks, she could do it.  She was interested in learning how to use a computer so she could find part-time work.  She had recently been treated for hives, and worried about how she was going to pay the $59 bill for treatment.  Minor was tearful and upset at her inability to do the things she once was able to do.  (Tr. 192.)

On February 3, 2005, Minor saw Clark for her dysthymia.  She was dressed casually, more upbeat, but moving slowly from pain.  She had been busy taking care of her husband and children.  Being busy helped her depression.  Her pain still limited her activity.  She had completed a patient assistance form to get help paying for her Flexeril.  (Tr. 191.)

---

[13]Urticaria, also known as hives, is an eruption of itching wheals, and may be caused by hypersensitivity to foods or drugs.  Stedman's Medical Dictionary, 1676.

[14]Zyrtec is an anti-histamine used to treat symptoms such as itching, runny nose, watery eyes, and sneezing from allergies.  It is also used to relieve itching from hives.  Calamine is used to treat itching and pain caused by skin irritations, such as cuts, insect bites, or rashes. http://www.webmd.com/drugs. (Last visited August 22, 2008).

On February 15, 2005, Minor saw Clark for her depression. She appeared to be very depressed, and was sad and tearful through most of the session. Minor said there were times when she felt unable to go forward with daily life. She had not heard back from the patient assistance program, and was trying to get disability, but was skeptical that anything would happen. Minor stated that she wanted to desperately work. She complained of hot flashes and trouble sleeping because of headaches. Clark recommended anti-depressant medication, but Minor worried about how she could afford it. (Tr. 190.)

On March 1, 2005, Minor saw Clark for her dysthymia. She was moving very slowly and appeared tired. She was having difficulty cooking, and was worried about her weight. With the cold weather, she was not able to get outside as much. Minor showed a positive attitude about persevering, and stated the counseling had been helpful. Clark informed Minor that she was no longer able to provide the counseling services for free. As a result, there was no plan for future visits. (Tr. 189.)

On June 13, 2005, Minor received a mammogram. Dr. Joel Hassien, M.D., found no significant changes, and recommended a follow-up screening in six months. (Tr. 205.)

On September 21, 2005, Minor saw Dr. Schneider, complaining of right arm pain. Minor thought the pain might be a result of overuse, but could not remember any recent changes in physical activity. She was unable to complete her chores because of the pain and immobility. She was able to sleep, and did not have any numbness, tingling, or weakness in the right upper extremity. At the time, Minor was taking Flexeril. A physical examination showed no bony point tenderness. Minor had decreased range of motion, and tenderness to palpation over the first metacarpal phalangeal.[15] She tested positive for Finkelstein's sign, but her sensation was intact.[16] Dr. Schneider diagnosed Minor with a right

---

[15]The carpus, metacarpus, and phalanges, are all bones of the hand. Stedman's Medical Dictionary, Plate 1.

[16]Finkelstein's sign is used to test for de Quervain's tenosynovitis. De Quervain's tenosynovitis is a condition brought on by irritation or inflammation of the wrist tendons at the base of the thumb. American
(continued...)

shoulder and right wrist strain, and recommended that she avoid
exacerbating activities and over-the-head work. Dr. Schneider
recommended Ibuprofen and Flexeril. (Tr. 212-13.)

On September 26, 2005, Dr. Raul Martin, M.D., reviewed a MRI of
Minor's right wrist and right shoulder. The MRI of her right wrist
revealed fluid collection, most likely the result of a synovial cyst in
the joint space between the carpal and metacarpal bones.[17] There was also
extensive subchondral cyst formation involving the carpal bones, but also
involving the early stages of the scaphoid and lunate bones.[18] There was
no evidence of any acute fractures or dislocations within the carpal
area, but there was evidence of severe or fairly advanced degenerative
arthritic changes of most of the intercarpal joint spaces. (Tr. 223-24.)

The MRI of her right shoulder revealed degenerative osteoarthritic
changes of the acromioclavicular joint, with inflammation at the
supraspinatus tendon.[19] There was a small amount of fluid in the joint
space and the subcoracoid bursa, but no evidence of any fractures,
dislocations, bone contusions, subluxations, or tears.[20] (Tr. 225-26.)

---

[16](...continued)
Society for Surgery of the Hand, http://www.assh.org/Content/
NavigationMenu/PatientsPublic/HandConditions/deQuervainsTendonitis/
deQuervain_s_Tendon.htm. (Last visited August 22, 2008).

[17]Synovial refers to fluid in the joints. Stedman's Medical
Dictionary, 1541. A cyst is an abnormal sac containing gas, fluid, or
a semisolid material with a membranous lining. Id., 387.

[18]Subchondral means below the cartilage. Stedman's Medical
Dictionary, 1492. The scaphoid and lunate bones are small bones in the
wrist. Id., 1104.

[19]The acromioclavicular joint is a joint at the top of the shoulder,
joining the scapula with the clavicle. Stedman's Medical Dictionary, 18,
Plate 8, Plate 10. The supraspinatus tendon is a tendon of the back of
the shoulder, and makes up the rotator cuff. See id., 1006, Plate 8.

[20]A bursa is a closed sac or envelope lined with synovial membrane
and containing fluid. Stedman's Medical Dictionary, 221-22. Subcoracoid
refers to below the scapula (shoulder blade). Id., 19, 1386.
Subluxation is an incomplete dislocation; the normal relationship is
altered, but there is some contact between joint surfaces. Id., 1494.

On September 29, 2005, Minor saw Dr. Imelda P. Cabalar, M.D., complaining of right shoulder pain. The pain began about four months earlier, without any precipitating cause. The pain was worse with movement, and 10/10 at its worst. Ultracet helped the pain.[21] Minor also complained of pain at the right wrist and thumb, and lower back pain. At the time, Minor was taking Ultracet and Flexeril. A physical examination showed Minor was well-nourished and in no apparent distress. She had a regular heart rate and rhythm, and her lungs were clear. Her abdomen was soft and non-tender, with normoactive bowel sounds. Her right shoulder had tenderness with decreased range of motion. The left shoulder had full range of motion. Both knees had crepitation, but no tenderness or effusion.[22] The cervical spine had full range of motion, and no tenderness, while the lumbosacral spine had tenderness with paravertebral muscle spasms. Dr. Cabalar diagnosed Minor with joint pains, secondary to degenerative joint disease, right rotator cuff tendinitis, and a right de Quervain's tenosynovitis. Dr. Cabalar recommended steroid injections at the right shoulder and right wrist, and range of motion exercises. Dr. Cabalar also recommended physical therapy, but Minor declined because of financial concerns. Minor reported improvement after the Lidocaine injection.[23] (Tr. 208-10.)

On September 29, 2005, Minor saw Dr. C. Leann Boxerman, D.O., complaining of a fever and sore throat. Dr. Boxerman diagnosed Minor with pharyngitis and upper respiratory infection, and prescribed Zithromax and Guaifenex.[24] (Tr. 211.)

---

[21]Ultracet is used to treat pain, particularly short term pain. http://www.webmd.com/drugs. (Last visited August 22, 2008).

[22]Crepitation refers to crackling, and can be the noise or vibration produced by rubbing bone or irregular cartilage surfaces together. Stedman's Medical Dictionary, 368. Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity. Id., 491.

[23]Lidocaine is an anesthetic used to numb an area of the skin or body. http://www.webmd.com/drugs. (Last visited August 22, 2008).

[24]Pharyngitis is inflammation of the mucous membrane and underlying parts of the pharynx - the upper portion of the digestive tube, between
(continued...)

On October 11, 2005, Dr. John Gamble, III, M.D., reviewed an MRI of Minor's lumbar spine.  The MRI revealed mild disk dessication at L3-4, with a broad-based anular disk bulge, but no evidence of significant stenosis.[25]  There was severe degenerative disk disease at L4-5, and L5-S1, with broad-based, ring-shaped disk bulges, but no evidence of significant stenosis.  (Tr. 220-21.)

On October 11, 2005, Dr. Schneider wrote to Minor.  An MRI of Minor's hand revealed a possible cyst, and Dr. Schneider suggested Minor see an orthopedic specialist for hands.  (Tr. 222.)

On October 13, 2005, Dr. Cabalar wrote to Minor, explaining the results of an MRI on her lumbar spine.  The MRI revealed severe degenerative disk disease at L4-5 and L5-S1, but there was no evidence of significant canal stenosis.  There was also a mild disk dissection at L3-4, with a broad base annular disk bulge.  There was no evidence of significant central canal stenosis.  (Tr. 216.)

On November 23, 2005, Minor saw Dr. Schneider, complaining of back pain.  She now weighed 195 pounds, up 10 pounds from the previous visit. A physical examination showed Minor had full strength in the lower extremities and no ataxia.[26]  Dr. Schneider diagnosed Minor with polyarthropathies, degenerative joint disease, and degenerative disk

---

[24](...continued)
the mouth and the esophagus.  Stedman's Medical Dictionary, 1178-79. Zithromax, or Azithromycin, is an antibiotic, used to treat very serious infections.  Guaifenex is used to relieve coughs caused by breathing illnesses.  http://www.webmd.com/drugs. (Last visited August 22, 2008).

[25]The human spinal column consists of thirty-three vertebrae.  There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.
Dessication is the drying out of the intervertebral disks.  Id., 422.  Stenosis is the narrowing or constriction of any canal.  Id., 1473.

[26]Ataxia is an inability to coordinate the muscles in the execution of voluntary movement.  Stedman's Medical Dictionary, 147.

disease.  Dr. Schneider prescribed Flexeril, Ibuprofen, and Ultracet.
(Tr. 229.)

On December 13, 2005, Minor saw Dr. Schneider for a follow-up.
Minor said she was feeling better, but still felt pain in the right
shoulder, 7/10 at its worst.  A physical examination showed tenderness
in the right shoulder.  Her left shoulder, elbows, wrists, and ankles
showed full range of motion with no tenderness or effusion.  Her hips
showed decreased range of motion, but no tenderness.  Her knees had
crepitation, but full range of motion and no tenderness.  The cervical
and lumbosacral spine had full range of motion and no tenderness.  Dr.
Schneider diagnosed Minor with joint pain, right rotator cuff tendinitis,
and right de Quervain's tenosynovitis, which had resolved.  Dr. Schneider
recommended shoulder exercises.  (Tr. 230-31.)

On March 16, 2006, Minor saw Dr. Schneider, complaining of chest
heaviness with shortness of breath, particularly when lying down.  Dr.
Schneider diagnosed Minor with pneumonia and swelling in the neck, and
prescribed Avelox.[27]  (Tr. 231-32.)

On March 22, 2006, Minor saw Dr. Nichols.  Minor was no longer able
to work because of her bad back.  She also complained of arthritis in the
knees.  A physical examination showed Minor had high blood pressure and
was overweight at 210 pounds.  Her neck was supple, with no adenopathy
or thyroid enlargement.[28]  Her lungs were clear, with a normal sinus
rhythm, and the Avelox seemed to have worked for the pneumonia.  Her
abdomen was soft and non-tender.  Dr. Nichols diagnosed Minor with
pneumonia, hypertension, depression, and chronic back pain.  He
prescribed Lisinopril, and continued her on Piroxicam and Trazodone for
the depression, and Ultram and Flexeril for the back pain.[29]  He

_____

[27]Avelox is an antibiotic used to treat bacterial infections.
http://www.webmd.com/drugs. (Last visited August 22, 2008).

[28]Adenopathy is swelling or morbid enlargement of the lymph nodes.
Stedman's Medical Dictionary, 26.

[29]Lisinopril is used to treat high blood pressure.  Piroxicam is used
to reduce pain, swelling, and joint stiffness from arthritis.  Trazodone
is used to treat depression.  Ultram is used to relieve moderate pain.
(continued...)

recommended that Minor lose weight, consume less salt, and quit smoking.
Dr. Nichols noted that documentation supported her claims of back pain.
(Tr. 233-34.)

On March 27, 2006, Minor saw Dr. Bhagirath H. Katbamna, M.D., who
recommended a screening colonoscopy.  (Tr. 235-36.)

On April 10, 2006, Dr. Hassien reviewed a CT scan of Minor's chest.
The CT scan revealed an interstitial pattern throughout the lungs, but
no evidence of masses, effusions, or lymphadenopathy.[30]  (Tr. 237.)

On April 26, 2006, Minor saw Dr. Pranav R. Parikh, M.D., complaining
of interstitial lung disease.[31]  Dr. Parikh noted Minor had baseline
hypoxemia and shortness of breath, especially when walking, but no
hemoptysis.[32]  She did not have any chest pain, sinus trouble, sore
throat, or hay fever.  Dr. Parikh thought the Lisinopril might be
contributing to her coughing spells.  Dr. Parikh diagnosed Minor with
interstitial lung disease, systemic hypertension, and pulmonary
hypertension.  Dr. Parikh prescribed DuoNeb for her shortness of breath,
and Cozaar for her hypertension, instead of Lisinopril.[33]  (Tr. 238-41.)

On May 3, 2006, Minor completed a disability report.  She stated
that her depression, back problems, and circulation problems prevented

---

[29](...continued)
http://www.webmd.com/drugs. (Last visited August 22, 2008).

[30]Lymphadenopathy is any disease process affecting the lymph nodes.
Stedman's Medical Dictionary, 900.

[31]Interstitial lung disease refers to a group of disorders that cause
progressive scarring of the lung tissue.  The scarring affects the
ability to breath and to get enough oxygen into the bloodstream.  Common
symptoms are shortness of breath and a dry cough.  MayoClinic.com,
http://www.mayoclinic.com/health/interstitial-lung-disease/DS00592. (Last
visited August 25, 2008).

[32]Hypoxemia is a deficiency in the concentration of oxygen in the
arterial blood.  Stedman's Medical Dictionary, 756.  Hemoptysis is the
spitting of blood from the lungs as a result of pulmonary hemorrhage.
Id., 701.

[33]DuoNeb is used to treat severe breathing trouble caused by ongoing
lung diseases.  It relaxes the muscles around the airway to make
breathing easier.  Cozaar is used to treat high blood pressure.
http://www.webmd.com/drugs. (Last visited August 22, 2008).

her from working.  Because of these impairments, she could not do a lot of lifting, could not stand for long periods of time, and had stomach problems.  She became unable to work on June 15, 2004, because she could no longer lift patients.  As a nurse, she had to pass out medications, draw blood, prepare charts, and reposition, bathe, and move patients. She lifted up to a hundred pounds, and frequently lifted less than ten pounds.  She had to lift walkers, patients, and bed pans.  (Tr. 147-53.)

On May 8, 2006, Dr. Hassien reviewed a CT scan of the chest.  The CT scan revealed septal thickening, suggesting interstitial lung disease.[34]  There was no evidence of bronchiectasis, effusion, masses, or lymphadenopathy.[35]  (Tr. 242.)

On May 11, 2006, Minor saw Dr. Parikh.  Minor was doing fair, but complained of shortness of breath and wheezing.  Dr. Parikh diagnosed Minor with interstitial lung disease and COPD.  Dr. Parikh recommended Minor continue with the DuoNeb, and begin taking Advair.[36]   Her interstitial lung disease was "very subtle," so there would be continuing follow-ups.  (Tr. 243-44.)

On May 30, 2006, Minor saw Dr. Linda M. Cooke, M.D., for a skin exam, after noticing dark spots on her arms.  A physical examination showed Minor had firm hyperkeratotic hyperpigmented papules on her forearms.[37]  She also had a lichenified plaque along her nail folds.[38]  The

---

[34]The septum is a thin wall dividing two cavities or masses of softer tissue.  Stedman's Medical Dictionary, 1405.

[35]Bronchiectasis is chronic dilation of the bronchi or bronchioles, stemming from an inflammatory disease or obstruction.  Stedman's Medical Dictionary, 212.

[36]Advair is used as a long-term treatment for wheezing and breathing troubles, caused by asthma or lung disease.  http://www.webmd.com/drugs. (Last visited August 22, 2008).

[37]A papule is a small, circumscribed, solid elevation on the skin. Stedman's Medical Dictionary, 1131.  Hyperkeratosis is an increase in the bulk of the horny layer of the skin.  Id., 741, 746

[38]Lichen is a discrete flat papule or an aggregate of papules with a configuration that resembles lichen growing on rocks.  Stedman's Medical Dictionary, 864.

remainder of her skin showed no evidence of worrisome lesions.  Dr. Cooke diagnosed Minor with prurigo nodularis and lichen simplex chronicus with nail dystrophy, and recommended Kenalog and Vanos.[39]  (Tr. 245.)

On June 14, 2006, Minor saw Dr. Parikh for a follow-up on her interstitial lung disease.  Minor was doing fair and had made significant improvement in her symptoms.  She was tolerating the Advair and DuoNeb well, and was not wheezing as much.  Dr. Parikh diagnosed Minor with interstitial lung disease, COPD, and increased Sjogren's antibody.[40]  Dr. Parikh referred Minor to Dr. Cabalar to test for Sjogren's disease or lupus.[41]  (Tr. 246-47.)

On June 21, 2006, Minor saw Dr. Nichols for a follow-up.  Minor had hypertension, chronic back pain, and aches and pains in her shoulders, knees, and hips.  She was overweight and depressed.  Dr. Nichols diagnosed Minor with high blood pressure, and recommended increasing her Cozaar dosage, with periodic checks on her blood pressure.  (Tr. 248.)

On June 27, 2006, Minor saw Dr. Cooke for a follow-up.  Minor's skin lesions had improved, but she had some new ones.  She still had nail dystrophy.  Dr. Cooke continued Minor on Kenalog, and prescribed Lidex gel.[42]  (Tr. 249.)

_____

[39]Prurigo nodularis, or Hyde's disease, is an eruption of hard nodules in the skin, accompanied by intense itching.  Stedman's Medical Dictionary, 1277.  Neurodermatitis, or lichen simplex chronicus, refers to chronic lichenfied skin lesions.  Id., 1045.  Kenalog and Vanos are steroids used to treat a variety of skin conditions. http://www.webmd.com/drugs. (Last visited August 22, 2008).

[40]Sjogren's syndrome is characterized by inflammation of the cornea, dryness of the mucous membranes, lesions or spots on the face, and enlargement of the glands by the ear.  The syndrome is often seen in menopausal women.  Stedman's Medical Dictionary, 821, 1141, 1537.

[41]Lupus erythematosus is an auto-immune disease which occurs in different forms.  Chronic lupus erythematosus is characterized by skin lesions alone.  Subacute lupus erythematosus is characterized by recurring superficial non-scarring skin lesions that are more disseminate than in the chronic form.  Systemic lupus erythematosus affects vital organs and structures.  Stedman's Medical Dictionary, 898.

[42]Lidex, or Fluocinonide, is used to treat a variety of skin conditions. http://www.webmd.com/drugs. (Last visited August 22, 2008).

On June 28, 2006, Minor saw Dr. Cabalar.  Minor had pain in her feet, which had started six months earlier.  A physical examination showed hyperpigmented, slightly raised lesions on her upper extremities.  Her shoulders, elbows, wrists, hips, ankles, and knees had full range of motion, with no tenderness or effusion.  She had full range of motion in the cervical spine with no tenderness, but did show tenderness in the lumbosacral spine.  Dr. Cabalar diagnosed Minor with degenerative joint disease, polyarthritis, Raynaud's disease, and a rash suggestive of an autoimmune disease, specifically lupus.[43]  Minor did not have dry eyes or dry mouth, which would have suggested Sjogren's syndrome.  Dr. Cabalar recommended a biopsy of the rash.  (Tr. 250-52.)

On June 28, 2006, Dr. Raul Martin, M.D., reviewed an x-ray of Minor's right foot.  The x-ray showed no evidence of any fractures or dislocations.  The joint spaces were well-maintained, without narrowing, and the soft tissues showed no significant abnormalities.  The x-ray was normal.  (Tr. 253-54.)

**Testimony at the Hearing**

At the hearing on July 18, 2006, Minor began by describing her work history.  She last worked in June 2004, providing full home care for a bedridden woman.  She bathed, dressed, and fed her.  Minor stopped working at the home when she could no longer move the patient (the woman weighed nearly 400 pounds).  The job required moving the patient between her bed, the shower, and her chair.  Before the home care, Minor worked as a floor nurse, at a nursing home.  She distributed medication, fed the patients, helped get them up, helped dress them, and did bed checks.  She worked at this particular nursing home for six months.  She had to quit because she was working too hard - close to eighty hours a week.  Minor worked one full-time job that did not involve nursing.  In 2002, she worked at a day care for about eight months.  She left that job because she had to lift the children, who weighed between fifty and seventy

---

[43]Raynaud's disease is the purplish coloration of the skin and mucuous membranes due to deficient oxygenation of the blood, a result of arterial and arteriolar contraction.  Cold temperatures or emotion can bring on these symptoms.  Stedman's Medical Dictionary, 383, 1535.

pounds.  Minor thought she could no longer work at the day care because she could not bend and lift anymore.  (Tr. 295-305.)

Minor was being treated for shortness of breath, arthritis, potential Lupus, and high blood pressure.  At the time of the hearing, she was taking Trazodone for depression, Piroxicam for arthritis, Flexeril for her back, Advair and DuoNeb for shortness of breath, Ultram, and Aspirin.  Sometimes the drugs made her dizzy, made her lose her appetite, or gave her a headache.  She never went through physical therapy because she was unable to afford it.  (Tr. 305-08.)

In a typical day, Minor woke up around 5:00 a.m., made breakfast for her husband, and did things around the house.  Minor did most of the cooking, laundry, cleaning, and shopping for the household.  Her daughters drove her to the stores, and her grandchildren did the yard work.  She enjoyed sewing in her spare time.  Minor believed she could lift a gallon jug in each hand.  Walking was difficult because of her back problems and shortness of breath.  (Tr. 308-13.)

Minor had recently gained weight, after a period of having no appetite due to stress.  She was attending counseling for depression, until the funding for the services ran out.  She was more depressed at the time of the hearing than when she was receiving counseling.  Her health, her husband's health, and not being able to do the things she once was able to do, contributed to her depression.  She had crying spells three or four times a month.  If she had had the money, Minor would have continued with the counseling.  (Tr. 313-16.)

Minor had trouble with her arm.  At times, she was unable to move her thumb and could barely raise her arm.  About half the time she was unable to reach overhead.  Her arm occasionally caused her pain, though the steroid injections were helpful.  Her fingers swelled, and in cold weather, they felt numb.  She also had sores on her arm that were to be biopsied.  Her back was her most serious problem though.  Her back caused her pain, which radiated to her thighs and legs, and gave out on her. When it gave out, she could not move for a week at a time.  The pain medication helped ease the pain, but did not relieve it completely. Walking was difficult because her feet hurt.  (Tr. 316-20.)

Shopping was difficult, and Minor brought her grandchildren with her to help lift the groceries and take them to the car. She had to take a break and sit down to catch her breath after twenty or thirty minutes of washing the dishes. She had to rest after fifteen minutes of vacuuming because her toes froze up. Minor was able to sleep well with her medication. When she cooked, she had to be sure to pick up her skillets with two hands, so she would not drop them. She was able to sew without too much difficulty, but needed to move around after every twenty minutes. Minor could sit for between twenty and thirty minutes, and stand for thirty minutes before becoming uncomfortable. She did not think she could lift a gallon jug repeatedly. (Tr. 320-26.)

Minor worried about her husband because of his COPD. Her daughter was no longer serving in Iraq, and was safely back in Hannibal, Missouri. (Tr. 326-28.)

John F. McGowan testified as a vocational expert (VE). He noted that Minor had an excellent employment record as a licensed practical nurse. Because she was lifting patients, McGowan testified that the work was heavy work, even though the Dictionary of Occupational Titles (DOT) classified it as medium work. The ALJ did not have a physical residual functional capacity (RFC) established for Minor, so the ALJ created a hypothetical situation. The ALJ had McGowan assume Minor could lift fifty pounds occasionally, lift twenty-five pounds frequently, could not use the right upper extremity to work above shoulder level, and needed to avoid concentrated exposure to noxious fumes, odors, and dust. Under these circumstances, McGowan testified that Minor could not perform her past relevant work as a nurse, but could perform unskilled, light work, such as information clerk, referral information aide, and registration clerk. There were only 421 reception information clerk jobs in Minor's service area, and the other jobs were not common enough to have reported numbers. Under the hypothetical, Minor could also perform regular cashiering and other similar light work. There were about 1,900 cashier jobs in Minor's service area, of which over 90% would involve light work. (Tr. 328-36.)

The ALJ indicated he was going to send Minor out for a physical and psychological examination. (Tr. 336-40.)

**Post-Hearing Examinations**

On August 21, 2006, Minor saw Dr. Frank Froman, Ed. D., a clinical psychologist, for a psychological evaluation. Minor arrived early, had adequate hygiene, and was cooperative for her examination. Minor complained of depression. She was "not capable anymore," and her husband had COPD and was "a handful." Minor also complained of significant back problems, radiating down both legs, hypertension, difficulty breathing, and general difficulties with standing, sitting, bending, and stooping. At the time of the evaluation, she was taking Tramadol, Piroxicam, Trazodone, Plaquenil, Cozaar, Flexeril, DuoNeb, Advair, and Fluocinonide.[44] Dr. Froman found Minor's mood and affect suggested a slightly anxious and depressed individual, but whose ability to relate was good. Her speech was clear, appropriate, relevant, and easy to understand. Minor was not homicidal or suicidal. She did not socialize. She continued to smoke a pack a day, despite difficulties breathing. (Tr. 274-75.)

A mental examination showed Minor was oriented to person, time, and place, and was in good contact with reality. Dr. Froman estimated her IQ to be in the 80s.[45] She could read and write. Her score on the Beck Depression Inventory indicated moderate depression. Dr. Froman diagnosed her with chronic major depressive disorder, of mild to moderate severity, and assigned her a GAF score of 60. Dr. Froman concluded that Minor could perform one- and two-step assemblies, but not at a competitive rate. She was able to adequately relate, but minimally, to co-workers and supervisors. She could understand simple oral and written instructions, and retain them. She could also understand, remember, and

---

[44]Plaquenil is used, with other medications, to treat auto-immune diseases like lupus or arthritis. It can reduce skin problems associated with lupus and prevent swelling from arthritis. Tramadol is used to relieve moderate pain. http://www.webmd.com/drugs. (Last visited August 22, 2008).

[45]An IQ score between 71 and 84 is classified as borderline intellectual functioning. Hutsell v. Massanari, 259 F.3d 707, 708 n.3 (8th Cir. 2001). An IQ score of about 70 or below is classified as mental retardation. Id.

carry out detailed instructions. She had a slight limitation in her ability to make judgments on simple work-related decisions. Dr. Froman thought Minor was unlikely to "be able to withstand the stress associated with customary employment in her present state." Because she was vegetatively slow, Dr. Froman found Minor had a slight limitation in her ability to interact with others, and respond appropriately to work pressures and changes in the work setting. Dr. Froman spent fifty minutes with Minor. (Tr. 275-79.)

On August 24, 2006, Minor saw Dr. Arthur P. Greenberg, M.D., complaining of back problems and circulation problems. Minor had a history of back problems, depression, hypertension, shoulder pain, right wrist pain, and numbness and tingling in the extremities. Minor had recently been treated for lupus and insect bites. A physical examination showed Minor had a normal gait, and did not require an assistive device. She appeared stable and comfortable in both a supine and sitting position. Her intellectual functioning seemed normal, and her memory was fair. Her lungs and chest were clear, with no wheezes, rales, or rhonchi noted.[46] Her heart rate was regular. Her abdomen showed no signs of tenderness, guarding, masses, rigidity, or organomegaly. The upper and lower extremity joints showed no pain associated with movement, edema, or tenderness, and her range of motion was normal. There was no atrophy or deformities in the hands, she was able to make a fist, and her grip strength was equal and normal. There were no spasms or tenderness in the cervical or dorsolumbar spine, she had normal curvature, and normal range of motion. Her coordination was good, she could walk on her toes, stand on one leg, and get on and off the table without significant difficulty. She was able to squat with difficulty. (Tr. 263-69.)

In summary, Dr. Greenberg found Minor suffered from high blood pressure, likely suffered from COPD, and had multiple skin lesions on her extremities. Her impairments did not limit her ability to lift, carry, stand, walk, sit, push, or pull. She could frequently climb, balance, kneel, crouch, crawl, and stoop. She had no manipulative, visual, or

---

[46]Rhonchi are breathing sounds that would indicate inflammation of the lungs. Stedman's Medical Dictionary, 1361.

communicative limitations, but needed to avoid exposure to cold temperatures because of Raynaud's disease. (Tr. 269-73.)

### III. DECISION OF THE ALJ

The ALJ found Minor had the RFC to lift twenty pounds occasionally, lift ten pounds frequently, could stand for six hours in an eight-hour workday, and could sit for two hours in an eight-hour workday. She could not use her right hand to reach above shoulder level, and needed to avoid concentrated exposure to noxious fumes, odors, and dust. In making this determination, the ALJ considered objective medical evidence, opinion evidence, and Minor's obesity. (Tr. 14-17.)

The ALJ found that the record included evidence that supported some of Minor's allegations, but not to the extent alleged. Minor had back problems, but there was no evidence of significant stenosis or other continuing, disabling symptoms. Minor had knee problems, but her strength was normal in all extremities. She complained of pain in her feet, but x-rays were normal. An MRI showed a synovial cyst in her right hand, but Minor was able to sew, and had no problems with range of motion or grip strength. Despite degenerative changes in her shoulder, there were no signs of a partial or complete tear. Finally, Minor had shortness of breath, pneumonia, and interstitial lung disease, but was better with her medication, and subsequent testing showed significant improvement in her respiratory symptoms. (Tr. 17-18.)

Reports from Dr. Greenberg and Dr. Froman supported the ALJ's determination that Minor was not disabled. Dr. Greenberg noted no physical limitations after his examination. In the Medical Source Statement, Dr. Froman found Minor had only slight limitations. The ALJ looked to Dr. Froman's comments in the Medical Source Statement to provide context for his earlier statements. (Tr. 18-20.)

The ALJ found Minor only partially credible. Clinical signs associated with chronic pain were not consistently present during her physical examinations. There was no objective evidence of muscle atrophy, bladder dysfunction, persistent muscle spasms, neurological deficits, or inflammatory signs. Minor had a consistent work history, which suggested a motivation to work. On the other hand, there was no

evidence her physicians had ever placed any limitations on her physical activities.  There was no evidence her medication was ineffective or that it imposed significant adverse side effects.  Finally, her treatment had tended to be conservative in nature.  (Tr. 20.)

The ALJ found Minor's subjective complaints inconsistent with her daily living activities.  She shopped for groceries, prepared meals, did the laundry, and vacuumed.  She was able to care for her husband and to sew.  After considering the evidence, the ALJ found that Minor's impairments could be expected to produce the alleged symptoms, but that her statements concerning their intensity, persistence, and limiting effects were not entirely credible.  (Id.)

In his report, Dr. Greenberg found Minor had no exertional limitations.  The ALJ gave Minor the benefit of the doubt, and reduced her RFC to light work.  The ALJ found Minor was unable to perform her past relevant work.  But after accepting the testimony of the vocational expert, the ALJ found Minor had the RFC to perform work as a cashier or receptionist/information clerk.  Because Minor could perform other work in the national economy, she was not disabled within the meaning of the Social Security Act.  (Tr. 20-22.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole.  Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006).  "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision.  See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

In this case, the Commissioner determined that Minor could not perform her past work, but that she maintained the residual functional capacity to perform other work in the national economy.

## V.  DISCUSSION

Minor argues the ALJ's decision is not supported by substantial evidence. Specifically, Minor argues that the ALJ erred in finding she had the RFC to stand for six hours in an eight-hour workday. Minor also argues that the ALJ failed to specify why he did not find her credible. Finally, she argues the ALJ improperly relied on the VE's testimony. (Doc. 14.)

**Residual Functional Capacity**

Minor argues that substantial evidence does not support the ALJ's RFC determination. She argues that her obesity, back pain, foot pain, and breathing difficulties provide proof that she cannot stand for six hours in an eight-hour workday.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. Casey v. Astrue, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own

descriptions of her limitations.  <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217-18 (8th Cir. 2001).  Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  <u>Id.</u>  Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record.  <u>Casey</u>, 503 F.3d at 697; <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

In this case, the ALJ found Minor's allegations not entirely credible, and determined she was capable of performing work in the national economy.  To be exact, the ALJ found Minor had the RFC to occasionally lift twenty pounds, frequently lift ten pounds, stand for six hours in an eight-hour workday, and sit for two hours in an eight-hour workday.  The ALJ also found Minor could not use her right hand to reach above shoulder level, and needed to avoid concentrated exposure to noxious fumes, odors, and dust.  Substantial medical evidence supports these findings.

In November 2004, Minor had an adequate gait, was able to squat without difficulty, and could toe and heel walk.  She had no spinal spasms, and good upper and lower extremity strength.  That same month, Dr. Frish found Minor had never suffered any extended periods of decompensation, and did not have any severe mental impairments.  In December 2004, Kyla Clark assigned Minor a GAF score indicating moderate symptoms.

In March 2005, Minor showed a positive attitude and stated her counseling had been helpful.  In September 2005, Dr. Schneider advised Minor to avoid exacerbating activities and over-the-head work, but nothing more limiting.  That same month, an MRI showed no evidence of any acute fractures or dislocations in the carpal area.  Another MRI showed no evidence of any fractures, dislocations, bone contusions, subluxations, or tears in the right shoulder.  Dr. Cabalar found Minor had full range of motion and no tenderness in the cervical spine.  In October 2005, Minor had severe degenerative disk disease, but no significant stenosis.  In November 2005, Minor had full strength in the lower extremities.  In December 2005, Minor had full range of motion, with no tenderness, in her knees, ankles, wrists, and elbows.  Her tenosynovitis had also resolved.

In June 2006, Minor was doing fair and had made significant improvement with her breathing difficulties. Her skin lesions also showed improvement. That same month, Dr. Cabalar found she had full range of motion, without tenderness or effusion, in her shoulders (both right and left), elbows, wrists, hips, ankles, and knees. Her cervical spine had full range of motion without tenderness, but her lumbosacral spine showed tenderness. An x-ray showed no evidence of any fractures, dislocations, or other abnormalities in her feet. In August 2006, Dr. Froman found Minor had a good ability to relate, was not homicidal or suicidal, and was easy to understand. He also found she could understand, remember, and carry out detailed instructions. That same month, Dr. Greenberg found Minor had a normal gait, and appeared stable and comfortable sitting and lying down. She had normal range of motion, and her upper and lower extremity joints showed no pain associated with movement. He found she had no spasms or tenderness in the cervical or dorsolumbar spine, and had normal curvature. He concluded that Minor's impairments did not limit her ability to lift, carry, stand, walk, sit, push, or pull.

During her physical examinations, Minor showed significant improvement with her breathing difficulties. Her skin problems also showed improvement. Several doctors noted Minor had good range of motion, an adequate gait, and no tenderness or effusion in her joints. She exhibited good strength in her lower extremities. There was no evidence of any dislocations or fractures in her feet, hands, or shoulder area. Dr. Greenberg found she had no spasms or tenderness in the cervical or dorsolumbar spine, and had normal curvature. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (finding the ALJ properly discounted claimant's complaints where an MRI revealed largely normal alignment and curvature of the spine, no muscle spasms, and no tender points). None of Minor's doctors ever imposed any significant limitations on her functioning; at most, she was urged to avoid exacerbating activities. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability."). Finally, her doctors maintained a conservative

line of treatment throughout. See Craig v. Chater, 943 F. Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative treatment.").

During her psychological examinations, Minor received GAF scores indicating moderate symptoms. She never had any extended periods of decompensation, denied suicidal and homicidal thoughts, and could relate well. Dr. Froman found she could understand and carry out detailed instructions, and Dr. Frish found she did not have any severe impairments. There is nothing to indicate Minor's depression was disabling.

After reviewing the medical record, substantial medical evidence supports the ALJ's RFC determination.

## Subjective Complaints

Minor argues that the ALJ failed to specify why he did not find her credible.

The ALJ must consider the claimant's subjective complaints. Casey, 503 F.3d at 695 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called Polaski factors. Guilliams, 393 F.3d at 802. These factors include: 1) the claimant's daily activities; 2) the duration, frequency, and intensity of the claimant's pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and 5) functional restrictions. Id. That said, the ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination. Casey, 503 F.3d at 695. The ALJ may discount subjective complaints of pain, when the complaints are inconsistent with the evidence as a whole. Id. When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802. When the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." Casey, 503 F.3d at 696.

In this case, the ALJ found Minor only partially credible. The ALJ noted that Minor performed a number of daily activities - shopping for groceries, preparing meals, doing laundry, sewing, and caring for her husband. In addition, clinical signs associated with chronic pain were not present during Minor's examinations. Her physicians never placed any significant limitations on her physical activities, and their treatment remained conservative in nature. Finally, the ALJ noted that there was no evidence Minor's medications were ineffective or that they imposed significant adverse side-effects. Looking to the Polaksi factors, the ALJ properly explained the basis for his credibility determination.

**Hypothetical Question**

Minor argues the ALJ improperly relied on testimony from the vocational expert, because the VE's testimony was based an improper hypothetical.

The Commissioner can rely on the testimony of a VE to satisfy his burden of showing that the claimant can perform other work. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). For the VE's testimony to rise to substantial evidence, the ALJ's hypothetical question must be correctly phrased and must capture the concrete consequences of the claimant's deficiencies. Id. The ALJ's hypothetical question does not have to include all of the claimant's alleged impairments; it need include "only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).

The ALJ's hypothetical question had the VE assume that Minor could lift fifty pounds occasionally, lift twenty-five pounds frequently, could not work above shoulder level, and needed to avoid concentrated exposure to noxious fumes, odors, and dust. This hypothetical encompassed the demands of medium work. See 20 C.F.R. § 404.1567(c); see also Dictionary of Occupational Titles Appendix C - Components of the Definition Trailer, available at 1991 WL 688702. In his decision, the ALJ found Minor could lift twenty pounds occasionally, lift ten pounds frequently, could not reach above shoulder level, and needed to avoid concentrated exposure to noxious fumes, odors, and dust. Because the federal regulations and the

DOT classify the ability to lift twenty pounds occasionally and ten pounds frequently as light work, this hypothetical did not correspond with the ALJ's RFC determination.  See 20 C.F.R. § 404.1567(b); see also Dictionary of Occupational Titles Appendix C, available at 1991 WL 688702.

However, the ALJ had the VE testify about Minor's ability to perform light work, though not with great clarity.

> VE:  I didn't testify, but I mean cashier -- Your Honor, the problem we have is [if] I go above light [work] then you get into where [the claimant] can do everything.
> ALJ:  Right.
> VE:  Because you gave me medium in terms of weight.
> **ALJ:  Right.  Well, let's leave it at light now.**
> VE:  Yeah.
> ALJ:  So --.
> VE:  Okay.  Well, I'll go where I am with cashiering then, Your Honor.
> ALJ:  Okay.  How many of those would exist?
> VE:  All right, Your Honor, just a minute.  Within the state of Missouri 65,000.  Within the 16 counties 1900, Your Honor.
> ALJ:  Okay.
> **VE:  The majority of them light.**
> ALJ:  All right.  Like three quarters you think?
> VE:  Better than 90%.
> ALJ:  Oh, okay.  All right.  Well, I don't have any other questions.

(Tr. 335-36) (emphasis added).

Reviewing this testimony, the ALJ questioned the VE about Minor's ability to perform light work, which corresponded to Minor's RFC.  The ALJ did not find Minor suffered from any severe mental impairments.  Therefore, the ALJ had no duty to include any mental or psychological limitations in his hypothetical.  See Lacroix, 465 F.3d at 889.  Taken together, the ALJ's hypothetical question captured the concrete consequences of Minor's impairments.  The hypothetical question, while somewhat unclear, was proper.  See Johnson v. Apfel, 240 F.3d 1145, 1149 (8th Cir. 2001)  ("Any arguable deficiency . . . in the ALJ's opinion-writing technique does not require [the reviewing court] to set aside a finding that is supported by substantial evidence.").

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.


___/S/ David D. Noce___
**UNITED STATES MAGISTRATE JUDGE**


Signed on September 2, 2008.